WEYMOUTH (CRANE v.).　See Case No. 3,358.

1 [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

## Case No. 17,475.
### The W. F. GARRISON.
[1 Lowell, 139.] 1

District Court, D. Massachusetts.　March, 1867.

SALVAGE — RULE OF COMPENSATION — TOWAGE SERVICES.

1. In salvage, when the benefit received will warrant it, the salvors will be entitled to share to a greater or less degree in that benefit. The compensation should include a gratuity or premium for the encouragement of promptness and gallantry, and is not based merely on the value of the respective vessels and the dangers to which each was exposed, or to the hardships undergone.

2. Services rendered after reaching a port of safety, in towing to a port where repairs could be made, are towage, and not salvage.

3. Where a valuable steamer went in search of a schooner reported to be disabled, and found her after five hours' search, and towed her to a place of safety in two hours more, and afterwards towed her into port, these services being done in the intervals of the steamer's usual employment, and the last service being towage worth one hundred dollars, and the value saved was $11,000, the salvage awarded was $1,700.

Some hours before daylight, in the morning of the 28th of November last, the schooner William F. Garrison, on her voyage from Boston to the southward, in ballast, had arrived some ten or twelve miles to the westward of Gay Head, in Martha's Vineyard, and in trying to reef her mainsail in a heavy blow from the northwest was taken aback and lost her foremast and part of her maintopmast. The master rigged a stay from the mainmast head to the windlass and set one of her jibs, but was unable to work into Vineyard Sound, and brought up toward noon under the lee of the island of No-Man's-Land. He set a signal of distress and went on shore for assistance. He intended to go over to Martha's Vineyard to hire a steamer, but after engaging a boat and boat's crew, he thought the attempt too hazardous with the wind and sea as high as they then were. The wind blew from the north-west very heavily during the remainder of the day and some time into the night, and the schooner lay at a single anchor, and safely enough so long as the wind should remain in that quarter. In the course of the day the signal of distress was seen by Mr. Smith, the underwriters' agent at Chilmark, and he went seventeen miles to Edgartown, and arriving at about 8 p. m. notified the agent of the steamer Monohansett of what he had seen, but did not describe the place where the schooner lay with entire accuracy. The steamer was fired up and sent to Holmes Hole, where her master lives, and he joined her and took command. The wind was still blowing heavily and there was considerable sea outside, and the weather was unusually cold for the season. The steamer ran down to the place where they understood the vessel to be,

1 [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

and did not find her, and occupied some time in searching for her. They found her at last, and on coming up hailed to know if the schooner wanted assistance, and the answer was that she did. The steamer sent a boat with four men to assist in getting the anchor, but it was disputed whether this was by request or not. The schooner was not short-handed, and there was no danger in this service, for the wind and sea had by this time moderated considerably. The anchor was hove up, and a line from the steamer made fast to the schooner, and before the towing had begun the captain of the schooner called out to know what the charge would be. Captain Cromwell of the Monohansett answered that he could not tell, but it would not be unreasonable. It was now about one o'clock at night, and the steamer proceeded to tow the schooner to Tarpaulin Cove, which is a safe harbor with good anchorage about sixteen or seventeen miles from No-Man's-Land. In the afternoon of the same day she towed her to New Bedford, where the repairs were made. The Monohansett was a steamer valued by her owners at about seventy thousand dollars, employed chiefly as a passenger and freight carrier between New Bedford and Edgartown, touching at Holmes Hole and Wood's Hole. The trip was made once a day each way in summer, and in winter but one way on one day and back on the next. It was said that the steamer depended in part upon towage and salvage to meet her expenses in winter. The only other steamers in these waters were two tugs. one of which belonged to the libellants, and both had their headquarters at New Bedford, between thirty and forty miles from No-Man's-Land. It was said that one of these tugs appeared off No-Man's-Land soon after daylight the next morning after this service was rendered, and it was suggested that she came in search of a job in saving the schooner.

W. Crapo, for libellants.
C. Dodge, for claimants.

LOWELL, District Judge. This is a clear case for salvage. No bargain was in fact made, and Captain Cromwell was not bound to make any in the dark, after he had come out so far to render a salvage service. Whether Captain Smith could properly and prudently have refused to employ him unless he would make one is another question not important here, though I do not see how he could well refuse. The only question then is of the amount to be awarded, and this is always a difficult and delicate question, and one in which it has been said that courts can hardly hope to do more than to give satisfaction in the long run. There is and can be no market value or fixed standard for the reward of services which are in themselves unusual, and of which the reward is not expected to be based merely on the value of the services in the particular case, but is to include a gratuity or

premium for the encouragement of promptness, skill, and gallantry in future. The only standard that ever was set up, that of a moiety in cases of derelict, is found unsuited to modern times, and has been abandoned.

The parties differ pretty widely in their views of this matter. The claimant has offered eight hundred dollars, and the libellants think they should have three or four times that sum. Nearly all the facts which must be considered in arriving at a judgment were disputed, but the trial has cleared up most of these disputes. It is now agreed that the value of the property saved shall be taken as eleven thousand dollars. The work in the afternoon of the next day was towage, and was worth about one hundred dollars. What the salvors did is not the subject of much doubt. They started out promptly and spent some five hours in reaching the schooner, and during a part of this time the wind was boisterous and the sea rough, so much so that there was some hesitation in proceeding; the steamer as I suppose not being well adapted to sea work; the navigation between the Vineyard and No-Man's-Land is intricate, insomuch that the master of the schooner seems to consider it the only real difficulty he was under. Excepting this, the towage from No-Man's-Land to Tarpaulin Cove was not difficult. In distance it was about sixteen or seventeen miles, and the steamer was employed in all in the strictly salvage service seven or eight hours. She did not lose her regular trips between Edgartown and New Bedford, but performed the salvage in the interval, and the subsequent towage in another interval, between two trips.

The main discussion at the last upon these subordinate points was concerning the degree of peril from which the schooner was rescued. She was safe while the wind was at the northwest, but a gale from any other quarter would drive her ashore or to sea, and in either case her situation would be very bad. With fair weather she might probably have been worked to some leeward port, and it would depend on the direction of the wind what port she could make; or her crew with the aid of the fishermen and pilots on the island, might have rigged a jurymast; or the tugs at New Bedford might have heard of her. Making allowance for all contingencies, and taking the chances of the weather at that season, I cannot but consider the schooner to have been in considerable prospective danger and in urgent need of the services of a steamer when the Monohansett arrived.

I do not think the offer of eight hundred dollars was large enough. It is said that Captain Cromwell would probably have been glad to contract to do precisely what he did, for that sum or even less. This is not admitted by the libellants; but even if it were, it is not conclusive, because he did not make any contract. It was perhaps Captain Smith's misfortune or want of enterprise in the first instance which prevented a bargain being made;

for if he had got over to Chilmark he could have gone to Edgartown, and might have bargained with somewhat more leisure; but as he did not, and as Captain Cromwell started without any certainty of finding the schooner, or of being employed if he did find her, he is entitled to whatever the service is worth as a salvage service. As I have had occasion to say before, the salvors cannot be held to receive only what the work was worth to them, any more than the owners are bound to pay all it was worth to them, which may have been immensely greater; as an argument and consideration tending to enlighten the court both can be shown, and where the benefit received will warrant it, the salvors will be entitled to share to a greater or less degree in that benefit.

Upon the whole, considering the great value of the steamer, the promptness and efficiency of the service, the benefit conferred, and all the other elements of the service. I think that I ought to award the sum of seventeen hundred dollars. It should not be paid over until it is certain that the crew of the steamer are entirely satisfied with their shares. Salvage awarded.